**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**BARBARA R.**, as parent and
next friend of **S.R.**, a minor child;

      Plaintiff,

vs.                              **CIV. NO.  03-1225 MCA/WDS**

**CYNTHIA COUCH**, **ANGELA MAES**,
and **TYLER DUMARS**, in their individual
capacities, **DECEDENT PETER CHAVEZ**,
in his individual capacity, by and through
**THE ESTATE OF PETER CHAVEZ**,
**LOUISE DEHART** (f/k/a Louise Chavez),
and the **NEW MEXICO CHILDREN
YOUTH AND FAMILIES DEPARTMENT**,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS CASE** is about "S.R", a young girl who was born in August 1989 and has lived

in the revolving door of foster care placement during most of her childhood.  She has two

brothers and one sister and at all relevant times, she and her siblings were closely bonded to

one another.  Her biological parents were absent during much of her childhood due to

incarceration and abandonment.  They never regained physical custody of S.R. after

Defendant New Mexico Children, Youth and Families Department (CYFD) removed the

children from the home of their stepmother in May 1994 in conjunction with findings of

abuse and neglect.  The parental rights of the biological parents were terminated by no later

than June 15, 1999, leaving S.R. in the legal custody of Defendant CYFD by that date. [Ex. H, V to Doc. 188; Ex. A, L to Doc. 194; Ex. 7 to Doc. 207.] S.R. and her siblings were first placed in the Chavez foster home in November 1998.

In this lawsuit, Plaintiff alleges that while in the legal care, custody and control of CYFD, S.R. was repeatedly raped by her foster father, Peter Chavez.

There is evidence that despite the many "red flags" that were raised in connection with inappropriate sexual behavior in the Chavez foster home during S.R.'s placement there, and with her history of prior abuse, some of the Defendants in this case abdicated their professional responsibilities, thereby increasing S.R.'s vulnerability to the sexual assaults which give rise to this action.

**THIS MATTER** comes before the Court on *Defendant Tyler DuMars, Angela Maes, and Cynthia Sherman (f/k/a Couch) Consolidated Motion and Incorporated Memorandum for Summary Judgment* [Doc. 188] and *Defendant Estate of Peter Chavez and Louise DeHart's Motion for Judgment on the Pleadings and/or for Summary Judgment* [Doc. 193] filed on January 30, 2006. Having reviewed the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motions in part and denies the motions in part for the reasons set forth below.

## I.   BACKGROUND

On September 25, 2003, Plaintiff Barbara R. filed a civil action on behalf of her adopted daughter, S.R., in the Thirteenth Judicial District Court for the County of Valencia,

State of New Mexico.  Plaintiff's *Complaint* alleges that in the years 1999 and 2000, Peter Chavez sexually assaulted and abused S.R. while Mr. Chavez and his former spouse, Defendant Louise DeHart (f/k/a Louise Chavez), were acting as the child's foster parents. Defendant New Mexico Children Youth and Families Department (CYFD) allegedly employed Defendants Cynthia Sherman[1] (f/k/a Cynthia Couch), Angela Maes, and Tyler DuMars as social workers or legal guardians for S.R. during all or part of the time she was in the foster care of Mr. Chavez and Defendant DeHart.

Pursuant to 28 U.S.C. § 1441, Defendants removed this action to the United States District Court for the District of New Mexico on October 23, 2003, based on the presence of federal civil-rights claims.  [Doc. 1.]  Plaintiff was granted leave to conduct early discovery and extend the time for service of process based on the fact that Mr. Chavez's whereabouts became unknown around the time he was indicted on criminal charges in May 2002, and Defendant Sherman had moved from the State of New Mexico.  [Ex. A, B, C to Doc. 16; Doc. 17, 18.]  The parties then proceeded to amend their pleadings and file dispositive motions pursuant to a number of scheduling orders.

On July 13, 2005, Plaintiff filed her *Third Amended Complaint.* [Doc. 147.]  As a result of that pleading and prior amendments [Doc. 32, 94], Janet Parrot was dismissed as a Defendant, Tyler DuMars and Louise DeHart were added as Defendants, and the Estate

---

[1]Defendant Sherman is still listed by her former name, Cynthia Couch, in the caption; however, for the sake of consistency with the parties' briefs, this *Memorandum Opinion and Order* refers to this Defendant by her current married name, Cynthia Sherman.

of Peter Chavez was substituted for Mr. Chavez as a Defendant based on Plaintiff's discovery in 2004 that Mr. Chavez died on April 18, 2003. [Ex. 1 to Doc. 66.] Kari Morrissey was subsequently appointed to replace Plaintiff Barbara R. as S.R.'s personal representative and to serve as a guardian ad litem after the child ran away from home and Plaintiff Barbara R. lost contact with her. [Ex. 1, 2, 3, to Doc. 210; Doc. 224.]

Plaintiffs' *Third Amended Complaint* asserts two different categories of claims: (1) federal civil-rights claims under 42 U.S.C. § 1983 for violations of S.R.'s constitutional right to substantive due process under the Fourteenth Amendment, and (2) tort claims under state law for negligence, battery, assault, false imprisonment, and intentional infliction of emotional distress. [Doc. 147.] The federal civil-rights claims are divided into two counts: one against Defendants Sherman, Maes, and DuMars (collectively "the CYFD Defendants") and another against the Chavez Estate. Plaintiff's state-law claims also are divided into two counts: one against the Chavez Estate and Defendants DeHart and CYFD for the commission of several torts arising from an alleged breach of a duty of care they owed to S.R., and another against Defendants Sherman, Maes, DuMars, and CYFD arising from an alleged breach of a duty to protect S.R. from criminal acts perpetrated by third parties with whom they placed the child.

Defendants have moved for summary judgment on all counts of Plaintiff's *Third Amended Complaint*, asserting the defenses of (1) qualified immunity with respect to Plaintiff's federal civil-rights claims, (2) immunity under the New Mexico Tort Claims Act (NMTCA) with respect to Plaintiff's state-law claims, (3) immunity from punitive damages

against the Chavez Estate, and (4) the statute of limitations with respect to all claims.  [Doc. 188, 193.]  The undisputed facts and evidence of record regarding Defendants' motions can be summarized as follows.[2]

At the time Defendant CYFD first took physical custody of S.R. and her siblings in May 1994, the child was observed to have bruising and scarring due to abuse by her stepmother.  This abuse included the use of hands, fists, and a belt, including the buckle end. The children were dirty, unkempt, and dressed inappropriately, with redness and pus accumulations around their eyes due to eye infections.  [Ex. C, D, E to Doc. 194.]

The abuse did not end when S.R. entered Defendant CYFD's foster-care system. From May 1994 until her adoption by Barbara R. in July 2002, S.R. and her three siblings resided in several different foster homes, sometimes apart from one another.  Defendant CYFD maintained a "revolving door" through which several different social workers acted as the child's legal guardian on a temporary basis during this period.  The record reflects that some of these CYFD social workers stayed on her case for only a matter of months or weeks before resigning or being replaced.

---

[2]The Court's task of summarizing and providing citations to the evidence of record is complicated in this case because there is much duplication or overlap among the parties' exhibits and motion papers, and in each case the parties have elected to provide chambers with an undifferentiated pile of exhibits that is not indexed or organized in any discernible way.  Especially when the parties are given the privilege of exceeding the normal page limits provided in the Local Rules, the better practice is to create an index of exhibits (similar to an exhibit list used at trial) and separate each exhibit with tabbed dividers on the copy provided to chambers.

S.R. resided in the foster home of Mr. Chavez and Defendant DeHart (who were then married to one another) from November 30, 1998, until July 22, 1999, and from approximately the Thanksgiving holiday in November 1999 until August 30, 2000. Defendant Maes served as S.R.'s social worker and legal guardian from January 1999 until November 1999, when she was replaced by Defendant Sherman.  Defendant Sherman acted as the child's social worker and legal guardian from November 1999 until she left her employment with CYFD around June or July 2000.  Defendant DuMars was then assigned to act as S.R.'s social worker and legal guardian from July 10, 2000, until October 27, 2000. [Ex. A, B, E, K, L, M, R, S, V, Z to Doc. 188; Ex. 6, 7, 8, 17, 18, 20, 23, 24 to Doc. 205.]

According to clinical reports, the abuse S.R. suffered during the first nine years of her childhood probably included sexual assaults (or other inappropriate behavior with a sexual connotation) perpetrated by one or more other children residing in the foster homes where she and her siblings stayed before their placement in the Chavez/DeHart home.  The evidence does not suggest, however, that such prior abuse was the reason for moving S.R. to the Chavez/DeHart home at the end of November 1998.  [Ex. P, S, V to Doc. 188; Ex. L to Doc. 194; Ex. 7,  15, 18 to Doc. 205.]

Rather, it appears that the primary reason for moving S.R. and her siblings to the Chavez/DeHart home was to keep the children together as part of one family unit.  The child's guardian ad litem at the time, Cynthia Mercer, supported the move on these grounds. There was also a prospect that Mr. Chavez and Defendant DeHart would eventually adopt S.R. and her siblings.  [Ex. Z to Doc. 188; Ex. K to Doc. 194; Ex. 19 to Doc. 205.]

S.R.'s first stay at the Chavez/DeHart foster home ended on July 22, 1999, when Defendants Chavez and DeHart asked Defendant CYFD to remove the child from the home after she made an allegation that Defendant Chavez had "mooned" her by dropping his pants and exposing his private parts.  From July 22, 1999, until the Thanksgiving holiday later that year, S.R. resided in a respite home, and then in the All Faiths Receiving Home (AFRH). During this time, she was separated from her siblings, who remained at the Chavez/DeHart foster home.  [Ex. A, L to Doc. 188; Ex. L to Doc. 194; Ex. 6, 15 to Doc. 205; Ex. 2 to Doc. 207.]

The CYFD Defendants claim that they were unable to substantiate the alleged "mooning" incident and that S.R. later changed her story.  [Ex. L, N to Doc. 188; Ex. L to Doc. 194.]   Plaintiff points out, however, that this incident posed a dilemma for the child: either she could report Mr. Chavez's misconduct and be separated from her siblings as a result, or she could recant her story and be reunited with her siblings, who remained at the Chavez/DeHart foster home.  Thus, there was a strong motive for S.R. to minimize or deny Mr. Chavez's behavior in order to avoid being separated from her siblings.

During the time S.R. was at AFRH in 1999, her therapists observed behavior consistent with prior sexual abuse and opined that she was particularly vulnerable to such abuse.  They recommended that in the event the child was returned to the Chavez/DeHart foster home, there should be family therapy specifically addressing the past sexual abuse so that Mr. Chavez, Defendant DeHart, and the child's siblings could learn to appropriately handle S.R.'s sexually reactive behavior.  [Ex. 14, 15 to Doc. 205; Ex. 7 to Doc. 207.]

In November 1999, CYFD began the process of returning S.R. to the foster care of Defendants Chavez and DeHart, where her other siblings still resided. S.R. was allowed an overnight visit at the Chavez/DeHart foster home over the Thanksgiving holiday that year, and she was formally discharged from AFRH in mid-December 1999. The child then resided with Defendants Chavez and DeHart, as well as her siblings, until August 30, 2000, when S.R. was removed from the home of Defendants Chavez and DeHart and placed in the foster care of Barbara R.   [Ex. 15, 17, 20 to Doc. 205; Ex. 15 to Doc. 207.]

Again, it appears that the CYFD Defendants' main reason for returning S.R. to the Chavez/DeHart home was so that she could stay together with her siblings as a family unit, and the foster parents could continue to explore the prospect of adopting all the children. There was disagreement between Mr. Chavez and Defendant DeHart, however, as to whether to proceed with the adoption of S.R.  In addition, there is evidence that Mr. Chavez and Defendant DeHart declined to further participate in the therapeutic measures to treat S.R.'s past sexual abuse that were recommended by the child's therapists when the child was returned to their home.  Starting in 2000, CYFD employees began receiving reports from a neighbor alleging that Mr. Chavez had engaged in various forms of disturbing behavior with respect to the children.  By the end of 2000, Mr. Chavez and Defendant DeHart separated presumably over their marital and other differences, and their separation provided the reason for removing S.R. and her siblings from the Chavez/DeHart foster home on or about August 30, 2000.  As of that date, Mr. Chavez and Defendant DeHart were no longer living together.  Without his spouse, Mr. Chavez did not qualify to serve as a foster parent;

yet he continuously expressed his desire to adopt S.R. on his own.  [Ex. W to Doc. 188; Ex. 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 to Doc. 207.]

After leaving the Chavez/DeHart foster home at the end of August 2000, S.R. went to live with Barbara R., who then served as S.R.'s foster parent.  Barbara R. continued in that capacity and was a prospective adoptive parent from approximately September 2000 until the adoption was finalized on July 2, 2002.  [Ex. 1, 2, 3 to Doc. 210.]

On or about December 7, 2000, while in the foster care of Barbara R., S.R. reported for the first time that Mr. Chavez had raped her several times between approximately April 2000 and August 2000, while he was serving as her foster parent.  This report was subsequently confirmed in a safehouse interview, and eventually forwarded to the child's guardian ad litem, who referred the matter to another attorney in September 2001.  [Ex. M, O, P to Doc. 194.]

In her subsequent affidavit and deposition testimony, the child explained why she did not report this abuse earlier:   she thought no one would believe her, and she felt threatened by Mr. Chavez.  This belief followed from her perception of what happened when she reported the "mooning" incident:  the people who were supposed to be protecting her did not believe her and instead punished her by separating her from her siblings.  [Ex. 2 to Doc. 138; Ex. H to Doc. 188; Ex. N to Doc. 194; Ex. 3 to Doc. 205; Ex. 2 to Doc. 207.]

S.R.'s guardian ad litem, who had previously recommended that she be placed with her siblings in the Chavez/DeHart foster home, also explained in subsequent deposition testimony that she was not fully informed about the situation at the time.  In particular, she

noted that no one had ever informed her that Mr. Chavez and Defendant DeHart were not participating in the therapy to address S.R.'s past sexual abuse as recommended by the child's former therapists.  [Ex. W to Doc. 188; Ex. 19 to Doc. 205; Ex. 3 to Doc. 207.]

Defendant DeHart also was interviewed and later deposed regarding the allegations that Mr. Chavez sexually abused S.R.  In a March 2001 interview, Defendant DeHart allegedly told police that her marriage to Mr. Chavez "really started going bad" after S.R. returned from AFRH and that the marriage ended because he "chose the foster kids over her."  She also allegedly stated that Mr. Chavez favored S.R. and that S.R. was "always clinging" to him after the child returned from AFRH.  Mr. Chavez wanted S.R. back and wanted to adopt the child, while Defendant DeHart did not.  [Ex. 9 to Doc. 138.]

According to the March 2001 interview and Defendant DeHart's subsequent deposition testimony in 2004, Mr. Chavez stayed home and cared for the children while Defendant DeHart worked during the day.  At night, Mr. Chavez allegedly slept on a recliner in the living room, rather than in the master bedroom with Defendant DeHart, because he claimed that sleeping on a regular bed hurt his back or aggravated a neurological condition. After returning from AFRH, S.R. slept in a separate bedroom, apart from her siblings.  [Ex. 1, 2, 9 to Doc. 138.]

Defendant DeHart knew of S.R.'s prior allegations regarding the "mooning" incident and had personally observed S.R. engaging in inappropriate behavior with a sexual connotation (such as sitting on the arm of a sofa with her legs spread, and trying to put her hands on Mr. Chavez's crotch area while he was seated in his recliner watching a movie).

Defendant DeHart believed that S.R. was untruthful and manipulative, and she did not believe that Mr. Chavez was aroused by the child's misbehavior or that he would do anything to hurt any of the children.  [Ex. 1, 9 to Doc. 138.]

To protect against further allegations after S.R. returned from AFRH, Mr. Chavez allegedly installed a motion detector in the home that would trigger an alarm if any of the doors to the bedrooms (including S.R.'s bedroom) were opened during the night.  There is conflicting evidence, however, as to whether Mr. Chavez was capable of disabling the motion detector from where he slept in his recliner in the living room.  [Ex. 1, 2 to Doc. 138.]

In May 2002, a grand jury indicted Mr. Chavez  on eight counts of criminal sexual penetration and/or criminal sexual contact with a minor stemming from his alleged rape of S.R.  He was never served with the indictment, however, because by that time he had left the area and become a fugitive.  Plaintiff's counsel subsequently learned in 2004 that Mr. Chavez died on April 18, 2003, while apparently working as a truck driver in Illinois.  [Ex. A to Doc. 16; Ex. 1 to Doc. 66.]

On July 2, 2002, Barbara R.'s  adoption of S.R. was finalized, and Defendant CYFD no longer had legal or physical custody of the child.  Barbara R.'s relationship with the child deteriorated in the following years, however, with the result that S.R. ran away from home and was out of contact with her adoptive parent at some point after this litigation commenced.  This situation led Barbara R. to execute a power of attorney in favor of her sister on January 5, 2006, and Plaintiff's counsel ultimately sought and obtained court

approval to substitute Kari Morrisey as personal representative and guardian ad litem for the child in this litigation.  [Ex. 1, 2, 3 to Doc. 210; Doc. 191, 224.]

## II.   ANALYSIS

### A.   Standards of Review

Defendants have moved for summary judgment under Fed. R. Civ. P. 56 and for judgment on the pleadings under Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings under the latter rule is reviewed under the same standard as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  See Nelson v. State Farm Mut. Auto. Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005).  Under this standard, the Court may dismiss a complaint for failure to state a claim upon which relief may be granted at any time.  See Fed. R. Civ. P. 12(h)(2).  Dismissal on these grounds may occur *sua sponte* or upon a defendant's motion.  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001).  When requested in a defendant's motion, dismissal under this rule is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  *Sua sponte* dismissal in this context is only appropriate when it is patently obvious that the plaintiff cannot prevail on the facts alleged, and allowing an opportunity to amend would be futile.  See Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir.1991); Curley, 246 F.3d at 1284.

"The court's  function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is

legally sufficient to state a claim for which relief may be granted." Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991).  Although mere conclusory allegations without supporting factual averments will not suffice,  see Brown v. Zavaras, 63 F.3d 967, 972 (10th Cir. 1995), Plaintiff's pleadings are to be liberally construed, and all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party.  GFF Corp., 130 F.3d at 1384.  "In addition to the complaint, the [C]ourt may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002).

When, as here, a defense of qualified immunity is raised in a pretrial motion under the above rules, this Court must exercise its discretion in applying the Federal Rules of Civil Procedure so as to protect the substance of that defense.  The Court may do so by requiring Plaintiff's pleadings to set forth specific, nonconclusory factual allegations in order to survive a dispositive pretrial motion, and by refraining from burdensome discovery or trial proceedings unless and until such pretrial motions have been resolved in Plaintiff's favor. These procedural rules, however, do not impose a heightened pleading requirement in this context.  See Crawford-El v. Britton, 523 U.S. 574, 594-600 (1998); Currier v. Dolan, 242 F.3d 905, 915 (10th Cir. 2001).  Rather, the Court applies the "customary motion to dismiss standard," Currier,  242 F.3d at 917, except to the extent that Defendants' motions invoke a different standard under Fed. R. Civ. P. 56.

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  <u>See</u> <u>id.</u> at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670-71 (10th Cir. 1998).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  <u>See</u> <u>Gross v. Pirtle</u>, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  <u>See</u> <u>id.</u> at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  <u>See</u> <u>id.</u>

-14-

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall, 935 F.2d at 1111). Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

This standard is of particular importance in this case, where the viability of most of Plaintiff's claims depends to a great extent on the credibility of S.R.'s allegations that Mr. Chavez sexually abused her at certain times while she was in foster care under the legal custody of Defendant CYFD. For purposes of Defendants' summary-judgment motions, the

Court is required to assume the truth of S.R.'s testimony regarding this issue.  And where conflicting inferences may be drawn from the evidence concerning Defendants' duty to detect and prevent such abuse, Fed. R. Civ. P. 56 requires the Court to draw all reasonable inferences in Plaintiff's favor in this context.

### B.   Plaintiff's Federal Civil Rights Claims

Plaintiff's *Third Amended Complaint* asserts substantive due-process claims pursuant to 42 U.S.C. § 1983 against Defendants Sherman, Maes, DuMars, and the Chavez Estate. In response to these claims, the CYFD Defendants have raised the defenses of qualified immunity and the statute of limitations, and the Chavez Estate also contends that Mr. Chavez was not acting under color of state law.  For the following reasons, I conclude that the Chavez Estate is entitled to summary judgment on Plaintiff's federal civil-rights claims based on the lack of state action, but the statute of limitations does not provide a basis for granting summary judgment in favor of any of the remaining Defendants on these claims.  I further conclude that Defendant Maes is entitled to summary judgment on Plaintiff's federal civil-rights claims based on the defense of qualified immunity, but this defense does not provide a basis for granting summary judgment in favor of Defendants Sherman or DuMars.

### 1.   State Action under 42 U.S.C. § 1983

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable

> to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

A prerequisite to any claim under this statute is that the Defendants were acting "under color of" state law at the time they allegedly violated S.R.'s constitutional right to due process. Id. Plaintiff easily meets this prerequisite with respect to Defendants Sherman, Maes, and DuMars, and these Defendants do not contest that they are state actors. [Doc. 152, ¶ 5.] Further analysis is required, however, to determine whether the foster parent, Peter Chavez, can be considered a "state actor" for purposes of Plaintiff's claim under 42 U.S.C. § 1983 against the Chavez Estate.

In its motion papers, the Chavez Estate has cited authorities from other circuits which stand for the proposition that foster parents are not state actors for purposes of 42 U.S.C. § 1983, even when there exists a state statute defining foster parents as public employees. See, e.g., Leshko v. Servis, 423 F.3d 337, 341-47 (3d Cir. 2005); Rayburn v. Hogue, 241 F.3d 1341, 1348-49 (11th Cir. 2001); Milburn v. Anne Arundel County Dep't of Social Servs., 871 F.2d 474, 479 (4th Cir. 1989).  While the parties cite nothing from the Tenth Circuit that is directly on point, the weight of authority from other circuits is persuasive and accords with the Tenth Circuit's general framework for determining the parameters of state action in this context.  See Lynn v. St. Anne Institute, No. 03 CV 1333, 2006 WL 516796, at *17 (N.D.N.Y. Mar. 2, 2006) (unpublished decision and order adopting the reasoning of other circuits in the absence of binding precedent).

Specifically, the Tenth Circuit has identified "four tests . . . to determine whether private parties should be deemed state actors when conducting a state action analysis: (1) the public function test, (2) the nexus test, (3) the symbiotic relationship test and (4) the joint action test." Johnson v. Rodrigues, 293 F.3d 1196, 1202 (10th Cir. 2002). Applying each of these tests, other courts have persuasively reasoned that foster parents who abuse a child in their care are not acting under color of state law for purposes of 42 U.S.C. § 1983. See Leshko, 423 F.3d at 341-47; Rayburn, 241 F.3d at 1348-49; Milburn, 871 F.2d at 479; Lynn, No. 03 CV 1333, 2006 WL 516796, at *17.

In this case, Plaintiff asserts that Mr. Chavez's role as a foster parent satisfies the "public function" test because the New Mexico Tort Claims Act (NMTCA) defines the term "public employee" to include licensed foster parents providing care for children in the custody of CYFD during the relevant time period. See N.M. Stat. Ann. § 41-4-3(F)(4) (Michie 2004). I disagree with this assertion, because the "public function" test "does not allow state definitions to dictate federal court decisions under § 1983." Leshko, 423 F.3d at 342.

Rather, the "ultimate question . . . in all state action cases" is whether the defendant's conduct is "'fairly attributable to the State.'" Id. (quoting West v. Atkins, 487 U.S. 42, 54 (1988)); accord Johnson, 293 F.3d at 1203; Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995). And it is the defendant's "function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." West, 487 U.S. at 55-56.

According to the Tenth Circuit, "[t]he public function test consists of determining whether the state has delegated to a private party 'a function traditionally exclusively reserved to the States.'"  Johnson, 293 F.3d at 1203 (quoting Gallagher, 49 F.3d at 1456). "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" Flagg Bros. v. Lefkowitz, 436 U.S. 149, 158 (1978) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 356 (1974)).  In particular, the Tenth Circuit has ruled that the "adoption process" is not a public function under this "arduous standard."  Johnson, 293 F.3d at 1203.  Other courts have similarly concluded that the provision of foster care is not a public function for purposes of establishing state action under 42 U.S.C. § 1983,  even when state law defines a foster parent as a public employee.  See Leshko, 423 F.3d at 343-47; Rayburn, 241 F.3d at 1347; Milburn, 871 F.2d at 479.

In the alternative, state action may be proven by means of the "nexus test," under which a private party may be considered a state actor for purposes of 42 U.S.C. § 1983 if "'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'"  Gallagher, 49 F.3d at 1448 (quoting Jackson, 419 U.S. at 351).  Under this approach, "a state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'"  Id. (citing Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).  Further, such an exercise of coercive power or significant encouragement must be directed toward "the specific conduct of which the plaintiff complains," and thus the mere

"existence of government regulations," or contracts under which a private party receives government funds, is not sufficient to establish the required nexus.[3]  Gallagher, 49 F.3d at 1448.  "Finally, under the nexus test, '[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.'"  Id. (quoting Blum, 457 U.S. at 1004-05).

The Tenth Circuit has concluded that state involvement in the "adoption process" does not establish the required nexus for state action under 42 U.S.C. § 1983.  See Johnson, 293 F.3d at 1203-04.  Other courts have similarly concluded that state involvement in the provision of foster care does not establish a nexus with the private abusive conduct of a foster parent.  See Leshko, 423 F.3d at 340-41; Rayburn, 241 F.3d at 1348; Milburn, 871 F.2d at 479.

The third method for proving state action is to show a "symbiotic relationship" under which the government has "'so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'" Gallagher, 49 F.3d at 1451 (citing Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961)).  More recent authorities refer to such a relationship using the term "entwinement." Johnson, 293 F.3d at 1204-05 (citing  Brentwood Acad. v. Tenn. Secondary Sch. Athletic

---

[3]While the existence of government regulations does not aid Plaintiff in her federal civil-rights claim against the Chavez Estate, the extent of these regulations may be relevant to the viability of her tort claims under state law.  See Johnson v. Holmes, 455 F.3d 1133, 1140 (10th Cir. 2006).  I consider Plaintiff's tort claims and the impact of Holmes in a later section of this *Memorandum Opinion and Order*.

Ass'n., 531 U.S. 288, 302 (2001)).  But "extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action."  Gallagher, 293 F.3d at 1451.

Thus, the Tenth Circuit has rejected the notion that a state "has insinuated itself into a position of long-term interdependence with either the adoption center or the adoptive parents" merely because the latter parties invoked the state's legal procedures to transfer custody of a child to the adoptive parents.  See Johnson, 293 F.3d at 1205.  Other courts have similarly concluded that there is no entwinement or symbiotic relationship between the government and the abusive conduct of private individuals with whom the state contracts to provide foster care for a child in state custody.  See Leshko, 423 F.3d at 341; Rayburn, 241 F.3d at 1348.

The final legal theory of which Plaintiff may avail herself to prove state action is the "joint action" test, which requires a showing that "a private party is a 'willful participant in joint action with the State or its agents.'"  Gallagher, 49 F.3d at 1453 (quoting Dennis v. Sparks, 449  U.S. 24, 27 (1980)).  "When applying this analysis, courts generally 'examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'"  Johnson, 293 F.3d at 1205 (quoting Gallagher, 49 F.3d at 1453).  Generally this test requires a showing that the state "substantially assisted in the allegedly wrongful conduct" or "share[d] a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action."  Gallagher, 49 F.3d at

-21-

1455. "Just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." Id. at 1453.

Again, the Tenth Circuit has rejected the notion that a state's involvement in the adoption process constitutes state action under the "joint action" test. See Johnson, 293 F.3d at 1205. And again, other courts have similarly rejected claims that state involvement in the provision of foster care renders a foster parent's abuse of a child in his care a "joint action" with the state. See Leshko, 423 F.3d at 341.

The authorities cited above do not establish a categorical rule that foster parents can never be considered "state actors" for purposes of 42 U.S.C. § 1983, nor does this Court adopt such a rule. I recognize, for example, that at least one district court has found it possible to plead a viable substantive due-process claim against a foster parent under the First Circuit's version of the "nexus" and "entwinement" tests when there is an allegation that several other state agents actually knew the foster parent was abusing the child in her care and actively worked with her to cover up that abuse in order to accomplish a shared goal of retaining custody of the child. See Howard v. Malac, 270 F. Supp. 2d 132, 145-46 (D. Mass. 2003).

But here the Chavez Estate has moved for summary judgment, so Plaintiff is not entitled to rely on the allegations in her pleadings alone; rather, she must come forward with evidence which could support a reasonable inference of state action under at least one of the four tests articulated by the Tenth Circuit. Even when viewed in the light most favorable to Plaintiff, the evidence of record in this case does not support a reasonable inference that Mr.

Chavez perpetrated the abuse of S.R. with the type of collusion from the CYFD Defendants alleged in <u>Howard</u>, 270 F. Supp. 2d at 145-46.

Viewed in this light, the evidence of record suggests that there were CYFD employees who failed to heed numerous warning signs that might have prevented (or led to more expeditious discovery of) Mr. Chavez's abuse of the child.  These warning signs included, among other things, the report of the "mooning" incident, the complaints from a neighbor, the discontinuation of recommended therapy to address past sexual abuse, the growing marital discord between Mr. Chavez and Defendant DeHart, and the known vulnerabilities occasioned by S.R.'s history of abuse and neglect.  But this evidence does not support a reasonable inference that any of the CYFD employees actually knew what illegal acts Mr. Chavez was perpetrating and joined him in an effort to cover  them up or allow them to continue.  For all of the above reasons, I conclude that the Chavez Estate is entitled to summary judgment on Plaintiff's federal civil-rights claims under 42 U.S.C. § 1983.

## 2.    <u>Statute of Limitations for Claims Under 42 U.S.C. § 1983</u>

I next turn to the statute-of-limitations defense as it pertains to Plaintiff's federal civil-rights claims.  Defendants contend that such claims are barred by the applicable statute of limitations because they were not filed within three years after S.R. was removed from the Chavez/DeHart home at the end of August 2000.  <u>See</u> <u>Garcia v. Wilson</u>, 731 F.2d 640, 651 (10th Cir. 1984) (en banc) (applying three-year statute of limitations for personal-injury actions borrowed from N.M. Stat. Ann. § 37-1-8 to civil-rights claims under 42 U.S.C. § 1983), <u>aff'd</u> 471 U.S. 261, 280 (1985).

-23-

In Garcia, 471 U.S. at 267, the Supreme Court arrived at this three-year statute of limitations by following the three-step procedure set forth in 42 U.S.C. § 1988:

> First, courts are to look to the laws of the United States "so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect." If no suitable federal rule exists, courts undertake the second step by considering application of state "common law, as modified and changed by the constitution and statutes" of the forum state.   A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not "inconsistent with the Constitution and laws of the United States."

Burnett v. Grattan, 468 U.S. 42, 47-48 (1984) (quoting 42 U.S.C. § 1988); accord Garcia, 471 U.S. at 267.  Focusing on the second step in this process, Garcia establishes a bright-line rule for applying the three-year statute of limitations borrowed from N.M. Stat. Ann. § 37-1-8.  This bright-line rule leaves no room for a district court to pick and choose among other statutes from which a limitations period might be borrowed in this context.  See Blake v. Dickason, 997 F.2d 749, 750-51 (10th Cir. 1993); Yruegas v. Vestal, 356 F. Supp. 2d 1238, 1242-43 (D.N.M. 2004).

This bright-line rule does not end the Court's inquiry, however, because "'[i]n virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application.'" Garcia, 471 U.S. at 269 n.17 (quoting Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 464 (1975)).  And under the third step of the procedure set forth in 42 U.S.C. § 1988, courts also may need to examine "whether the state limitations statute conflicts with federal law and policy" as applied to a particular plaintiff.  Lake v. Arnold, 232 F.3d 360, 369 (citing Hardin v. Straub, 490 U.S. 536, 543- 44 (1989)).  Thus, it remains to be determined when Plaintiff's

claims accrued, the extent to which the three-year limitations period may be tolled, and whether Defendants may be equitably estopped from asserting a statute of limitations defense under the circumstances presented here.

In the Tenth Circuit, "state law determines the appropriate statute of limitations and accompanying tolling provisions" for civil actions under 42 U.S.C. § 1983, while "federal law determines the accrual of" such claims.  Fratus v. Deland, 49 F.3d 673, 675 (10th Cir. 1995).  Under federal law, the general rule is that:  "claims accrue and '[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.'"  Alexander v. State of Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004) (quoting Indus. Constructors Corp. v. United States Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir.1994)).

Such a rule may be fundamentally unfair and inequitable when the injury involves the sexual abuse of a child under the age of twelve who has lived in a tenuous foster-care situation awaiting adoption for most of her life, including the period of abuse and subsequent years during which the limitations period may have run.  This situation evinces a gross imbalance of power between the child and her caregivers, which may severely inhibit the child's ability to recognize the wrongfulness of the abuse to which she was subjected, to credibly report such abuse in a timely and complete manner without fear of retaliation or reprisal, and to exercise diligence in pursuing federal civil-rights claims based on such abuse. Indeed, an inherent component of the sexual abuse alleged here is the perpetrator's effort to

-25-

conceal his misconduct from others and legitimize it in the eyes of his victim by exploiting this gross imbalance of power.

One way to avoid unfairness and inequity in this context is through tolling of the limitations period.  Under the tolling provisions of Colorado's statute of limitations, for example, the limitations period on a minor plaintiff's claims under 42 U.S.C. § 1983 "was tolled until her 'age disability' terminated on her eighteenth birthday."  Blake, 997 F.2d at 750.  New Mexico has similar statutes regarding actions by minors and victims of sexual abuse.  See N.M. Stat. Ann. § 37-1-10 (Michie 2004) (providing "minors and incapacitated persons" with "one year from and after the termination of such incapacity within which to commence" an action otherwise limited by the preceding sections of Chapter 37); id. § 37-1-30 (setting a limitations period for "an action for damages based on personal injury caused by childhood sexual abuse" that extends as late as "the first instant of the person's twenty-fourth birthday").

In Yuergas, 356 F. Supp. 2d at 1242-43, the court concluded that Section 37-1-30 is not a tolling provision but rather a statute of limitations in its own right.  As such, Section 37-1-30 cannot be used to trump the general statute of limitations for personal injury actions in Section 37-1-8 that must be borrowed for all actions under 42 U.S.C. § 1983 according to the bright-line rule articulated in Garcia, 731 F.2d at 651, and its progeny.  See Blake, 997 F.2d at 750-51; Yruegas, 356 F. Supp. 2d at 1242-43.  But the Yuergas court did not have occasion to consider whether Section 37-1-10 is a tolling provision that can be used to extend the three year limitations period otherwise applicable under Section 37-1-8, because Ms.

Yuergas was 22 years old at the time she commenced a civil action against her abuser, and therefore Section 37-1-10 would not have preserved her federal civil-rights claim in that action.  See Yuergas, 356 F. Supp. 2d at 1239.

I conclude that unlike Section 37-1-30, Section 37-1-10 is the type of accompanying tolling provision that may extend the three-year statute of limitations which would otherwise apply under 37-1-8.  This conclusion follows from the plain language and structure of New Mexico's statutes.  While Section 37-1-30 sets forth its own limitations period for a particular type of personal-injury action, Section 37-1-10 only sets forth a tolling rule to accompany "the preceding provisions of this chapter," which include the general statute of limitations for personal-injury actions in Section 37-1-8.  See Desert State Life Mgmt. Servs. v. Ass'n of Retarded Citizens of Albuquerque, 939 F. Supp. 835, 837 (D.N.M. 1996) (applying Section 37-1-10 to toll Section 37-1-8's limitations period in an action under 42 U.S.C. § 1983).  Further, "'it is plain that the disabilities to which the Legislature is referring are the disabilities of minority or mental incapacity themselves, not the disability to bring suit.'"  Id. (quoting O'Brien v. Massachusetts Bay Transp. Auth., 541 N.E.2d 334, 337 (1989)).

Plaintiff had not yet attained the age of majority at the time she commenced this civil action.  Therefore, even though a guardian ad litem or attorney was available to her, she may avail herself of the tolling provision for minors under Section 37-1-10.  See id.  Based on the application of this tolling rule borrowed from state law, I conclude that Defendants are not

entitled to summary judgment on their statute-of-limitations defense to Plaintiff's federal civil-right claims.

In the alternative, I also conclude that principles of equity and due process under both federal and state law serve to preclude summary judgment in Defendants' favor on this issue for the following reasons.  As noted above, the three-year statute of limitations adopted in Wilson and its progeny follows from the second step in the procedure set forth in 42 U.S.C. § 1988 for borrowing a limitations period from state law.  See Lake, 232 F.3d at 369 (citing Wilson, 471 F.3d at 268).  Under the third step of that procedure, the Court also must examine "whether the state limitations statute conflicts with federal law and policy" in this context.  Id. (citing Hardin, 490 U.S. at 543- 44).

Under this third step, courts "can turn to federal tolling doctrine" in "certain limited circumstances" where the "state tolling rules contradict federal law or policy."  Id. at 370.  And under federal tolling doctrine, a statute of limitations may be tolled "where the plaintiff 'in some extraordinary way has been prevented from asserting his or her rights,'" or in order to prevent "a party from profiting from its own wrongdoing," or "when the state statute of limitations would otherwise frustrate federal policy."  Id. (quoting Robinson v. Dalton, 107 F.3d 1018, 1022 (3d Cir.1997)) (other citations omitted).  New Mexico courts recognize similar principles of equitable tolling and equitable estoppel.  See Hagen v. Faherty, 2003-NMCA-060, ¶¶ 10-16, 133 N.M. 605, 66 P.3d 974 (collecting cases).

These equitable principles apply here because there are extraordinary barriers inhibiting a sexually abused child under the age of twelve from asserting her rights in a

tenuous foster-care or adoption situation.  Defendants should not be allowed to profit from their own wrongdoing in perpetrating the abuse or failing to heed the warning signs (including the child's earlier allegations) which could have prevented it or led to earlier detection.

The New Mexico Supreme Court has recognized the presence of such extraordinary barriers in holding that the NMTCA's statute of limitations may violate the Due Process Clause as applied to minors.  See Campos v. Murray, 2006-NMSC-020, ¶ 15, 139 N.M. 454, 134 P.3d 741.  "A two-year-old, an eight-year-old, or even an eleven-year-old, are all equally unable to comply with the statute of limitations requirement at such a young age," id. ¶ 14, and "we cannot presume that parents will adequately care for their child by filing such a claim in a timely manner" under the circumstances presented here.  Id. ¶ 15.

These due-process principles may extend to other statutes as well, see id. ¶ 13, and in this case, it would be paradoxical to conclude that a due-process claim under 42 U.S.C. § 1983 is barred by a state statute of limitations which itself violates the Due Process Clause as applied to a sexually abused child.  Such a paradoxical conclusion would frustrate the fundamental policies which 42 U.S.C. § 1983 is designed to advance.  See Lake, 232 F.3d at 370.

Defendants argue that Plaintiff should not be allowed to avail herself of these equitable or due-process principles in this case, because the evidence shows that S.R. first reported the abuse to Barbara R. in December 2000 and that the child's guardian ad litem, Cynthia Mercer, referred the matter to another attorney in September 2001.  Thus, according

to Defendants, the child already knew of her injuries and had an attorney to represent her by the Fall of 2001, leaving plenty of time for her attorney to file a civil action asserting her rights under 42 U.S.C. § 1983 before the three-year limitations period expired at the end of August 2003.

I acknowledge that there are situations in which courts have weighed equitable factors and due-process considerations in favor of a more strict application of the statute of limitations.  See, e.g., Erwin v. City of Santa Fe, 115 N.M. 596, 597-99, 855 P.2d 1060, 1061-63 (Ct.App.1993) (finding that a teenager who had retained counsel will be expected to comply with the ninety-day notice provision under certain circumstances).  For example, the equities ordinarily do not weigh in favor of tolling the statute of limitations where an adult plaintiff discovers the factual basis for her claim within the statutory limitations period, and it is only her lack of diligence or the inaction of her legal representatives which causes that claim to become untimely.  See, e.g., Tomlinson v. George, 2005-NMSC-020, ¶¶ 26-27, 138 N.M. 34, 116 P.3d 105 (declining to toll the statute of limitations for an adult's medical malpractice claim based on equitable or due-process principles); cf. See Gripe v. City of Enid, 312 F.3d 1184, 1188-89 (10th Cir. 2002) (citing the general rule that clients are bound by the actions of the attorneys they have selected to represent them).  But I do not agree that such actions on behalf of the child by her adult caregivers preclude the tolling of the three-year limitations period in this case.

Minors generally have only a limited role, if any, in the selection of an attorney to represent them, and thus it is always incumbent upon the Court to ensure that the rights of

minors appearing before it are safeguarded.  See Rider v. Albuquerque Pub. Schs., 1996-NMCA-090, ¶¶ 13, 122 N.M. 237, 923 P.2d 604 (discussing the court's role in safeguarding the rights of minors).  This is true in the context of foster care, where a child's life placement is heavily regulated, and it is especially true in the tenuous foster-care situation presented here, where the child's role is limited with respect to choosing who any of her adult caregivers or legal guardians will be for any particular period of time.

The essential question is "'whether it is reasonable to expect a person in the injured child's circumstances to be able to meet the requirement'" imposed by the three-year statute of limitations.  Campos, 2006-NMSC-020, ¶ 10 (quoting Jaramillo v. Bd. of Regents of the Univ. of N.M. Health & Scis. Ctr., 2001-NMCA-024, ¶ 7, 130 N.M. 256, 23 P.3d 931).  I conclude that it is not reasonable to expect the child to meet this requirement under the extraordinary circumstances present in this case.

It is inherently difficult for a child to recognize and pursue a claim against an abuser when the child's pursuit of that claim is dependent on the same adult caregivers or legal representatives who were supposed to be protecting the child from such abuse in the first place.  In this regard, I note that the guardian ad litem who first selected an attorney for S.R. in 2001 was the same guardian ad litem who previously had recommended that the child be placed in the Chavez/DeHart foster home in November 1998 and again in November 1999.  That guardian ad litem later admitted in her deposition testimony that she was not fully informed at the time she made these recommendations, and the evidence of record does not indicate that S.R. played any significant role in the guardian ad litem's selection of an

attorney to pursue her legal claims in September 2001.  [Ex. W to Doc. 188; Ex. K to Doc. 194; Ex. 19 to Doc. 205; Ex. 3 to Doc. 207.]

It is not reasonable to expect S.R. to play an effective role in selecting an attorney to represent her in this tenuous foster-care situation, because the child never had the opportunity to develop a long-term trusting relationship with any adult caregiver.  Instead, she was shuttled to and from a number of different foster homes during her childhood, and there was a high degree of turnover among the social workers and guardians assigned by the agency in whose legal custody she was placed.  S.R.'s past experience with this "revolving door" of foster parents and legal guardians gave her reason to believe that her relationship with her siblings could be threatened or disrupted any time she came into conflict with these temporary adult caregivers or CYFD employees.

For example, when S.R. first reported the alleged "mooning" incident involving Mr. Chavez, the response of her foster parents and CYFD employees was to place her in another home where she was separated from her siblings for several months, and then return her to the home of Mr. Chavez without the specific measures (such as the continuation of certain types of therapy) that would have aided in preventing or detecting inappropriate behavior on his part.  And when S.R. first reported being raped by Mr. Chavez, she was in the early stages of developing a new relationship with her prospective adoptive parent, Barbara R. That relationship also disintegrated a few years later, resulting in the need to replace Barbara R. as the personal representative in this case.

I also find it significant that S.R. was still a minor in the legal custody of Defendant CYFD at the time she first reported the abuse.  Defendant CYFD is, of course, one of the parties against whom Plaintiff's claims are asserted in this action, so there is an inherent conflict in expecting S.R. to assert a claim against CYFD or its employees when the child is still in the legal custody of that agency.  And by the time Defendant CYFD's legal custody ended and Barbara R. finalized her adoption of the child in July 2002, Mr. Chavez was a fugitive whose whereabouts were unknown to Plaintiffs, and Defendant Sherman also had resigned her position and left the state.  Even after this action was filed in September 2003, it was necessary for Plaintiff's counsel to request additional time to conduct early discovery regarding the status of these Defendants and to effect service of process.

Under these extraordinary circumstances, it is not reasonable to hold a child victim responsible for inaction or delay on the part of her caregivers or legal representatives.  Such a holding runs contrary to the general rule articulated in <u>Desert State Life Mgmt. Servs.</u>, 939 F. Supp. at 837, as well as the due-process principles articulated in <u>Campos</u>, 2006-NMSC-020, ¶ 15.  Especially when the child's injuries result from the neglect, abuse, or civil-rights violations of a foster parent or legal guardian, and those injuries hamper the child's ability to form trusting relationships with subsequent adoptive parents or guardians, it is improper "to penalize a child, already injured, for the subsequent neglect of that child's parent [or guardian] in failing to file suit in a timely manner." <u>Id.</u>; <u>see</u> <u>Rider</u>, 1996-NMCA-090, ¶¶ 11-15, 122 N.M. 237, 923 P.2d 604 (collecting cases).  Accordingly, the statute of limitations

does not provide a basis for granting Defendants' motions for summary judgment on Plaintiff's federal civil-rights claims.

### 3.      Merits of Plaintiff's Substantive Due-Process Claims

Apart from the statute-of-limitations defense, the CYFD Defendants also assert that they are entitled to summary judgment on Plaintiff's federal civil-rights claims based on the doctrine of qualified immunity.  Persons sued in their individual capacity under 42 U.S.C. § 1983 generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001).  The "salient question" is whether the state of the law at the time of the incident gave the individual defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

Because 42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere, my analysis of the qualified-immunity defense necessarily begins by identifying the specific federal right which

-34-

the CYFD Defendants are alleged to have violated.  See Graham v. Connor, 490 U.S. 386,

393-94 (1989); Dixon v. City of Lawton, 898 F.2d 1443, 1448 (10th Cir. 1990).  In this case,

the constitutional right at issue concerns the liberty interest in bodily integrity and physical

safety while in state custody that is articulated in the Supreme Court's jurisprudence

regarding the substantive component of  the Fourteenth Amendment's Due Process Clause.

The Fourteenth Amendment's Due Process Clause "generally confer[s] no affirmative

right to governmental aid, even when such aid may be necessary to secure life, liberty, or

property interests of which the government itself may not deprive the individual." DeShaney

v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989).  There are, however,

two exceptions to this general rule.  First, "state officials can be liable for the acts of third

parties where those officials 'created the danger' that caused the harm." Seamons v. Snow,

84 F.3d 1226, 1236 (10th Cir. 1996) (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir.

1995)).  Second, "if the state restrains an individual's freedom to act to protect himself or

herself through a restraint on that individual's personal liberty, the state may thereby enter

into a 'special relationship' during such restraint to protect that individual from violent acts

inflicted by others." Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1261 (10th Cir.

1998).

Both of these theories of liability were clearly established at the time of the alleged

violations in this case.  See Johnson v. Holmes, 455 F.3d 1133, 1142-43 (10th Cir. 2006);

Currier v. Doran, 242 F.3d 905, 924-25 (10th Cir. 2001); Sutton v. Utah State Sch. for the

Deaf and Blind, 173 F.3d 1226, 1241 (10th Cir. 1999);  Yvonne L. v. New Mexico Dep't of

Human Servs., 959 F.2d 883, 892-93 (10th Cir. 1992); K.H. ex rel. Murphy v. Morgan, 914

F.2d 846, 852-54 (7th Cir. 1990); Bailey v. Pacheco, 108 F. Supp. 2d 1214, 1220 (D.N.M.

2000).  Accordingly, my analysis turns to the question whether Plaintiff has presented

evidence to support a claim against each of the CYFD Defendants under either one of these

theories.

### a.      Special Relationship Theory

The "special relationship" theory is premised on "'the State's affirmative act of

restraining the individual's freedom to act on his own behalf--through incarceration,

institutionalization, or other similar restraint of personal liberty.'"  Armijo, 159 F.3d at 1261

(quoting DeShaney, 489 U.S. at 200).  In the type of foster-care situation presented here,

there is no question that each of the CYFD Defendants had a "special relationship" with S.R.

during the time they were employed by CYFD and assigned as her social worker or legal

guardian.  See Holmes, 455 F.3d at 1143; Yvonne L., 959 F.2d at 893.

The mere existence of a special relationship, however, is not enough to establish

individual liability under 42 U.S.C. § 1983.  Plaintiff also must show (1) that the CYFD

Defendants "knew of the asserted danger to [the child] or failed to exercise professional

judgment with respect thereto," Yvonne L., 959 F.2d at 890, (2) that there is "an affirmative

link to the injuries [the child] suffered," id., and (3) that this "abdication of professional

responsibility" is "sufficient to shock the conscience," Holmes, 455 F.3d at 1143.

This standard of liability draws a fine line between the "deliberate indifference"

standard applied to Eighth Amendment claims of prisoner abuse and the concept of

negligence applied to ordinary tort claims.  The Tenth Circuit has rejected the "deliberate indifference" standard in this context because "foster children, like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals." Yvonne L., 959 F.2d at 894 (quoting Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)).  On the other hand, "failure to exercise professional judgment" does not mean mere negligence in choosing among several professionally acceptable choices; rather, "it implies abdication of the duty to act professionally."  Id.  A standard of mere negligence is inappropriate here because "a substantive  due process violation must be more than an ordinary tort to be actionable under [42 U.S.C.] § 1983," Uhlrig, 64 F.3d at 573, and an exercise of professional judgment that is merely negligent cannot, as a matter of law, shock the conscience, see id. at 573-74.

To determine whether there was evidence of an abdication of professional judgment in this case, the Court first must analyze whether the CYFD Defendants were acting as professional decision-makers, i.e., "person[s] competent, whether by education, training or experience, to make the particular decision at issue." Youngberg, 457 U.S. at 323 n.30; Bailey, 108 F. Supp. 2d at 1220.  Action by a professional decision-maker

> is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.  In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints;  in such a situation, good-faith immunity would bar liability.

-37-

Youngberg, 457 U.S. at 323; accord Holmes, 455 F.3d at 1144.

In this case, there is undisputed evidence that during the relevant time periods, each of the CYFD Defendants were licensed social workers holding masters degrees in social work or related fields.  [Ex. E, L, R to Doc. 188.]  This evidence meets Youngberg's definition of a "professional," and hence the CYFD Defendants actions are presumptively valid.  See Bailey, 108 F. Supp. 2d at 1220.

With respect to Defendant Maes, Plaintiff has not come forward with evidence to rebut this presumption and defeat this Defendant's motion for summary judgment on the "special relationship" theory.  The evidence of record indicates that Defendant Maes was S.R.'s social worker or legal guardian from January 1999 to mid-November 1999.  [Ex. L, M to Doc. 188.]  S.R. and her siblings already had been placed in the Chavez/DeHart foster home in November 1998, before Defendant Maes took on this role.  [Ex. L, Z to Doc. 188.] Defendant Maes left her position and was replaced by Defendant Sherman before S.R. was returned to the Chavez/DeHart home for overnight visits beginning at the Thanksgiving holiday in November 1999.  [Ex. L to Doc. 188; Ex. 17 to Doc. 205.]  Thus, the evidence of record does not provide an affirmative link between Defendant Maes' tenure as S.R.'s social worker or legal guardian and the dangerous conditions which accompanied the child's return to the Chavez/DeHart foster home after that date.

The main issue in dispute during Defendant Maes' tenure was S.R.'s report of the "mooning incident" in July 1999.  The evidence of record does not support a reasonable inference that Defendant Maes had reason to know that Mr. Chavez posed any imminent

-38-

danger to S.R. before she received this report.  Further, the response of Defendant Maes and other CYFD employees was to promptly remove S.R. from the Chavez/DeHart foster home and place her at AFRH, where she could be monitored more closely and her allegations could be explored in a more controlled, therapeutic milieu.  [Ex. 6, 7 to Doc.  205.]  The prospective response developed while S.R. was at AFRH was to engage the family in further therapy to develop appropriate methods of handling S.R.'s sexually reactive behavior [Ex. 13, 14 to Doc. 205], but Defendant Maes was no longer employed as the child's social worker or legal guardian at the time the child was discharged from AFRH and this prospective response was to be implemented.  [Ex. L to Doc. 188; Ex. 15 to Doc. 205.]

Viewing the evidence of record in the light most favorable to Plaintiff under Fed. R. Civ. P. 56, I must assume the truth of S.R.'s testimony that she was, in fact, mooned and subsequently raped by Mr. Chavez.  It is reasonable to infer from this testimony that Defendant Maes was mistaken in concluding that the "mooning" incident did not occur, or that she was negligent in not taking further steps to attempt to substantiate S.R.'s allegations concerning this incident.  Unlike the allegations of physical abuse of a non-verbal infant at issue in Holmes, 455 F.3d at 1136-37, allegations of a foster parent's inappropriate sexual behavior toward a ten-year old child are not always easily verified by means of physical inspection and may require a more careful examination of both the parent's and the child's motives and veracity.  And there is conflicting evidence as to whether or why S.R. did or did not want to recant her allegations at some point during the CYFD investigation.  [Ex. A, H,

L, P to Doc. 188; Ex. 3, 4, 14 to Doc. 205.]   Under these circumstances, an exercise of professional judgment is critical.

The evidence of record does not, however, support a reasonable inference that Defendant Maes' response to the "mooning" incident constituted an abdication of her professional responsibility as the child's social worker or legal guardian.  In this context, a simple mistake or act of negligence in assessing the credibility of a child's accusations regarding a single incident with no physical evidence does not amount to an abandonment of one's professional judgment, so long as there is a meaningful effort to investigate the allegations in accordance with professional standards.  See Holmes, 455 F.3d at 1144.  And in this case, I cannot affirmative link Defendant Maes's response to the "mooning" incident with Mr. Chavez's subsequent abuse of S.R., because the evidence shows that neither S.R.'s return to the Chavez/DeHart foster home nor the family's discontinuation of therapy occurred during Defendant Maes' tenure as S.R.'s social worker.  For these reasons, Defendant Maes is entitled to summary judgment on Plaintiff's "special relationship" theory.

I reach a different conclusion with respect to Defendants Sherman and DuMars.  The evidence of record shows that during these two Defendants' tenure as S.R.'s social workers, there were numerous "red flags" which clearly indicated that the situation in the Chavez/DeHart home had become untenable and placed S.R. in grave danger of further sexual abuse.  From this evidence, a reasonable fact finder could conclude that these Defendants' response to this situation was to abdicate their professional responsibilities.

The evidence of record indicates that Defendant Sherman began working as S.R.'s social worker or legal guardian in mid-November 1999, as plans were being formulated to return the child to the Chavez/DeHart foster home for an overnight visit and engage the family in therapy to address her sexually reactive behavior and her allegations regarding the "mooning" incident.  What eventually transpired, however, was that the child was returned to the Chavez/DeHart foster home *without* the benefit of engaging the family (including Mr. Chavez) in the continuation of the specific therapeutic measures recommended by other professionals during and after her stay at AFRH, and *without* the full consent and participation of Defendant DeHart.  [Ex. 1 to Doc. 138; Ex. A, R, S, U, V to Doc. 188; Ex. 8, 15, 17, 18, 20, 21, 22 to Doc. 205.]

Viewed in the light most favorable to Plaintiff, the evidence concerning the failure to follow through with the therapists' recommendations could support a reasonable inference of "a substantial departure from accepted professional judgment, practice, or standards." Youngberg, 457 U.S. at 323.  Further, the evidence of record does not reflect that this departure was a result of "budgetary constraints" which rendered Defendant Sherman "unable to satisfy h[er] normal professional standards." Id.

While Defendant Sherman attempted to explain in her deposition testimony what the procedure was for obtaining another therapist after Mr. Chavez initially rejected the recommendations of the therapists who had previously treated S.R. [Ex. 16 to Doc. 205; Ex. R to Doc. 188], this Defendant does not explain her acquiescence in Mr. Chavez's subsequent decision to proceed with foster care despite his disagreement with both the

child's therapists and Defendant DeHart.    And there is no reference to any plausible professional judgment, practice, or standard which could support an alternative recommendation to discontinue therapy and comply with Mr. Chavez's increasingly bizarre demands.  Instead, Defendant Sherman states in her deposition testimony that she simply doesn't remember what happened as of mid-April and that she left CYFD in May.  [Ex. 16 to Doc. 205; Ex. R to Doc. 188.]

CYFD records, however, reflect that Defendant Sherman remained involved in CYFD's guardianship and treatment of S.R. until at least June 14, 2000, albeit without any resolution of the growing conflict among Mr. Chavez, Defendant DeHart, and the recommendations of S.R.'s former therapists.   By that time, the evidence of record suggests that Mr. Chavez had secretly begun his sexual assaults on S.R., and Defendant Sherman had been informed that there was a serious ongoing dispute between Mr. Chavez and Defendant DeHart about whether to continue as foster parents or consider adopting the child.  [Ex. A, B to Doc. 188; Ex. 8, 23, 24 to Doc. 205; Ex. 10, 11, 12 to Doc. 207.]  Viewed in the light most favorable to Plaintiff, this evidence could support a reasonable inference that Defendant Sherman abdicated her professional responsibility as S.R.'s social worker as of mid-April 2000.

Mr. Chavez's attempt to discontinue therapy and isolate his secretive relationship with S.R. from the scrutiny of outside therapists or even his own spouse can be analogized to the facts in Holmes, 455 F.3d at 1145, where shortly before killing a baby girl her abuser isolated the baby by removing her from day care and firing her home health nurses.

Especially in light of the therapists' diagnosis regarding S.R.'s vulnerability to further abuse and their recommendations for continued therapy to address this vulnerability, a reasonable fact finder could conclude that Mr. Chavez's behavior raised a number of "red flags" that it would be reckless to ignore.

Defendant Sherman's failure to intervene at this point is affirmatively linked to the sexual abuse that followed, because the evidence of record supports a reasonable inference that Mr. Chavez began raping S.R. around the time that Defendant Sherman acquiesced in his decision not to follow through on the recommendations of the child's therapists, and this acquiescence assisted Mr. Chavez in his efforts to manipulate the situation in order to conceal the abuse from others.  Further, an abdication of professional responsibility which is affirmatively linked to a foster parent's repeated rape of a ten or eleven year-old child is sufficient to shock the conscience.  See Sutton, 173 F.3d at 1241.  For these reasons, there are genuine issues of material fact which preclude summary judgment in favor of Defendant Sherman on Plaintiff's "special relationship" theory, and she is not entitled to qualified immunity at this juncture.

I also conclude that there are disputed issues of material fact which preclude summary judgment in favor of Defendant DuMars with respect to Plaintiff's "special relationship" theory.  The evidence of record indicates that Defendant DuMars was temporarily assigned as S.R.'s treatment social worker on or about July 10, 2000.  He wrote a letter to Mr. Chavez and Defendant DeHart dated August 23, 2000, which references "a shortage of treatment workers at our office" as the reason why he was given this temporary assignment in lieu of

-43-

his usual duties as a "Family Preservation Worker."  The evidence of record does not show, however, that Defendant DuMars' inactivity or inability to exercise professional judgment with respect to S.R. was caused by budgetary constraints in effect during his tenure as the child's social worker.  As with the other CYFD Defendants, Defendant DuMars has a masters degree in social work and was a licensed professional social worker during his employment with CYFD.  [Ex. E, J to Doc. 188.]

Defendant DuMars testified at his deposition that "[a] treatment social worker is responsible for ensuring that the children that are in the legal custody of CYFD meet their treatment plan in terms of dental visits, medical visits, that they're enrolled in school, things of that nature."  To meet these responsibilities, "a social worker can access a running narrative" of CYFD records regarding the child, and Defendant DuMars also recalled a "transfer staffing" which he could have used to aid him in this regard.  [Ex. G to Doc. 188.]

Viewed in the light most favorable to Plaintiff, even a cursory review of the information regarding S.R.'s treatment plan accessible in CYFD records would have alerted Defendant DuMars to a number of "red flags" that warranted immediate attention soon after he received the case in mid-July 2000.  First and foremost, S.R.'s foster family was not meeting the recommendations for continued therapy that were proposed when she left AFRH, and Mr. Chavez was actively resisting these recommendations.  In addition, there was serious marital discord in the family, which directly related to Mr. Chavez's treatment of S.R., and within the past month a neighbor had reported inappropriate behavior by Mr. Chavez.  The neighbor made a second report in mid-August 2000 in which she alleged,

among other things, that the "foster parents . . . are drinking and using drugs," and that she was Mr. Chavez "staggering around with a .22 in his hands."   Mr. Chavez wrote an e-mail to Defendant DuMars dated August 25, 2000, stating that Defendant DeHart no longer wanted to adopt the children (which had previously been reported to CYFD) and that he wanted to adopt them himself even if Defendant DeHart "may not be part of the picture." [Ex. I to Doc. 188; Ex. 29, 30 to Doc. 205; Ex. 7, 8, 9, 10, 11, 12, 13, 14 to Doc. 207.]

To counter all of this evidence that something was going seriously wrong in the Chavez/DeHart foster home, Defendant DuMars points to the fact that he conducted one home visit where he took the children to Burger King, and during that visit S.R. stated to him that things were "going good."   [Ex. G, H to Doc. 188.]  While apparently accepting this statement at face value, Defendant DuMars did not believe the child's earlier statement that Mr. Chavez had "mooned" her.  His reason for disbelieving the "mooning" allegation was that it was investigated and unsubstantiated, yet the evidence of record does not reflect that Defendant DuMars investigated or attempted to substantiate the child's statement that things were "going good."

Viewed in the light most favorable to Plaintiff, the evidence of record suggests that Defendant DuMars' response to the worsening situation in the Chavez/DeHart foster home was one of deliberate ignorance.  Defendant DuMars did not know of any calls that had been made about the family, and he did not believe it was his responsibility to investigate any allegations.  [Ex. E, G to Doc. 188.]  Because he did not believe it was his responsibility to investigate, he claims he did not come to know of anything that would pose a danger to S.R.

And because he did not come to know of such a danger, he contends that he cannot be held liable if anything went wrong.

Such deliberate ignorance may evince an abdication of professional responsibility. Indeed, the evidence of record suggests that Defendant DuMars did not make another visit to remove the children from Mr. Chavez's care until two or three days after Defendant DeHart called and reported that she had moved out of the home and was "concerned that [Mr. Chavez] would do something to the kids." [Ex. 8, 28 to Doc. 205.]  By that time it was too late:  the alleged sexual assaults had already occurred.

The evidence concerning Defendant DuMars' abdication of his professional responsibility as S.R.'s treatment social worker is affirmatively linked to the child's injuries, which were ongoing at the time.  As noted above, an abdication of professional responsibility which is affirmatively linked to a foster parent's repeated rape of a ten or eleven year-old child is sufficient to shock the conscience.  See Sutton, 173 F.3d at 1241.  For these reasons, there are genuine issues of material fact which preclude summary judgment in favor of Defendant DuMars on Plaintiff's "special relationship" theory, and he is not entitled to qualified immunity at this juncture.

### b.    Danger Creation Theory

I next turn to Plaintiff's claim that the CYFD Defendants are liable for substantive due-process violations under a "danger creation" theory.  The contours of this theory are well-established in the Tenth Circuit.  See Ruiz v. McDonnell, 299 F.3d 1173, 1182-83 (10th Cir. 2002); Currier, 242 F.3d at 918; Armijo, 159 F.3d at 1262-63.

> To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

Currier, 242 F.3d at 918.  In essence, the danger-creation theory "focuses on the affirmative actions of the state in placing the plaintiff in harm's way."  Id. at 919.  Thus, it is not sufficient to claim that a state actor passively allowed the *status quo* to persist or failed to come to the rescue *after* an individual was placed in harm's way.  Rather, a plaintiff must establish that a state actor actively changed the *status quo* by causing the plaintiff to be put in a position where he or she was more vulnerable to the alleged harm.

The affirmative conduct required to state a claim under the "danger creation" theory "should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration."  Ruiz, 299 F.3d at 1183.  Such "conduct should be directed at a discrete plaintiff rather than at the public at large."  Id.   Thus, state action which presents "a threat of indefinite range and duration" and does not, in and of itself, directly place an individual in danger generally cannot form the basis for a "danger creation" cause of action.  Id.

In the context of social work involving abused children, the elements of such a cause of action generally may be satisfied by showing that the State placed a child in the physical or legal custody of an abuser based on a recommendation or other action by a state social

worker that reflects a reckless and conscious disregard of an obvious or known substantial risk of serious, immediate, and proximate harm.  Such a conscious disregard may arise from a failure to investigate allegations of abuse or from a deliberate effort to conceal or prevent others from reporting or providing aid in response to evidence of such abuse.  See Currier, 242 F.3d at 919-22.  When a supervisor has knowledge that a subordinate is depriving an abused child of his or her constitutional right to substantive due process in this manner and fails to intervene, that supervisor also may be liable for the violation of the child's constitutional right.  See id. at 922-23.

Applying these standards, I conclude that there are genuine issues of material fact which preclude summary judgment in favor of Defendant Sherman with respect to Plaintiff's "danger creation" theory.  When viewed in the light most favorable to Plaintiff, the evidence of record supports a reasonable inference that this Defendant engaged in affirmative acts which endangered S.R. or increased her vulnerability to abuse by Mr. Chavez.  Specifically, while acting as the child's social worker or legal guardian between November 1999 and June 2000, Defendant Sherman played an active role in returning S.R. to the Chavez/DeHart foster home without the necessary safeguards to protect the child and her foster family from known vulnerabilities which had been identified by her therapists.  Defendant Sherman then acquiesced to Mr. Chavez's demands when they came into further conflict with the recommendations of the child's former therapists and Defendant DeHart.  These actions satisfy the first element of the "danger creation" theory with respect to Defendant Sherman

because they increased the child's known vulnerability to the danger of further sexual abuse. See Currier, 242 F.3d at 918; Ruiz, 299 F.3d at 1185.

The evidence of record also supports a reasonable inference that the other elements of a "danger creation" theory are satisfied for the purpose of defeating Defendant Sherman's motion for summary judgment. As in Currier, 242 F.3d at  920, the child at issue here is a member of a limited and specifically definable group, namely "children the state has removed from their natural parent[s] and taken into state custody."  Based on the therapists' diagnosis of S.R. as a child who was highly vulnerable to further sexual abuse, and their recommendation that family therapy was necessary to train the family on how to handle her sexually reactive behavior, it is reasonable to infer that the risk of harm to S.R. occasioned by Mr. Chavez' disagreement with the child's therapists and his spouse on these issues was serious, immediate, proximate, obvious, and known.  See id. at 918.  On this point, the failure to engage Mr. Chavez in the therapy recommended by the child's therapists is analogous to the failure "to adequately train school employees or adopt or implement a policy to prevent sexual assaults" that was alleged in Sutton, 173 F.3d at 1239-40.  As in Sutton, the allegations here do not amount to mere negligence, because the evidence of record concerning Defendant Sherman's tenure as the child's social worker is not limited to the child's earlier allegations regarding the "mooning" incident.  Rather, this evidence also includes the information gathered during the child's stay at AFRH, which identified her vulnerability to further sexual abuse and the need for additional therapy notwithstanding the unsubstantiated nature of her "mooning" allegations.  See id. at 1240 (considering a "danger

creation" claim "against the backdrop of [the child's] severe disabilities" and vulnerability to further abuse).

The evidence of record also may give rise to a reasonable inference that Defendant Sherman acted recklessly in conscious regard of the risk that Mr. Chavez would abuse S.R. when placed in his physical custody without the safeguards identified by the child's therapists or the cooperation of Defendant DeHart.  In this regard, the evidence of record suggests that Defendant Sherman persisted in her efforts to keep S.R. in the physical custody of S.R. despite her knowledge of the growing marital discord between Mr. Chavez and Defendant DeHart and the failure to engage the family in continued therapy.

It is possible that Defendant Sherman's conduct, if proven at trial, might not be considered as shocking to the conscience as the conduct alleged in Currier, 242 F.3d at 910, which resulted in a child being killed after his father poured boiling water on him, or in Armijo, 159 F.3d at 1256-58, which resulted in a despondent special-education student committing suicide after he was sent home from school without his parent's knowledge.  But the difference between this case and those two cases is a difference in degree and not a difference in kind.  State action resulting in physical or sexual abuse of a child need not result in the child's death in order to shock the conscience.  See, e.g., Sutton, 173 F.3d at 1239-42 (sexual abuse); Garcia v. Miera, 817 F.2d 650, 653 (10th Cir. 1987) (physical abuse).  Accordingly, the Court concludes that "the cumulative impression" of the conduct shown by the evidence of record "could be 'construed as conscience-shocking, depending on the context as determined after a full trial.'"  Currier, 242 F.3d at 920 (quoting Armijo,

159 F.3d at 1264).  It follows that Defendant Sherman is not entitled to summary judgment on Plaintiff's "danger creation" theory.

I reach a different conclusion with respect to the application of the "danger creation" theory to Defendants Maes and DuMars.  The evidence of record does not satisfy the first element of a "danger creation" cause of action against these two Defendants because during their tenure as the child's social worker or legal guardian, they did not engage in "affirmative conduct" which directly placed S.R. in the physical custody of her abuser under circumstances which increased her vulnerability.  See Sutton, 173 F.3d at 1239 (dismissing a danger-creation theory premised on conduct by an individual who "did not personally, affirmatively place [the child] in any danger").

As noted above,  S.R. and her siblings already had been placed in the Chavez/DeHart foster home in November 1998, before Defendant Maes took on the role of the child's social worker or legal guardian in January 1999.  The evidence of record also indicates that Defendant Maes left her position in mid-November 1999 and was replaced by Defendant Sherman before S.R. was returned to the Chavez/DeHart home for overnight visits beginning at the Thanksgiving holiday in November 1999.  [Ex. L, M, Z to Doc. 188; Ex. 17 to Doc. 205.]  Thus, the evidence of record does not show an affirmative act by Defendant Maes during her tenure as S.R.'s social worker or legal guardian which created the danger occasioned by Mr. Chavez's physical custody of the child after the "mooning" incident was reported.  On the contrary, S.R. was removed from Mr. Chavez's custody soon after this

incident was reported to Defendant Maes, and the evidence concerning the child's particular vulnerability to further abuse was not developed until after that removal.

A "danger creation" theory cannot be premised on the mere fact that Defendant Maes's involvement with S.R. preceded the sexual abuse that allegedly occurred when she was returned to the Chavez/DeHart foster home. Before the child was actually returned to that home, Defendant Maes's actions in failing to substantiate the allegations regarding the "mooning" incident "did not impose an immediate threat of harm" to S.R., as the child remained at AFRH or in a respite home before that date. Ruiz, 299 F.3d at 1183. A threat of future harm that is "of an indefinite range and duration" cannot form the basis for a "danger creation" claim against Defendant Maes. Id. And even if the failure to substantiate the child's allegations regarding the "mooning" incident was a "but for" cause of subsequent abuse, I cannot premise a "danger creation" theory on mere negligence in failing to substantiate this allegation. See id. at 1184 ("[O]rdinary negligence does not shock the conscience."). For these reasons, Defendant Maes is entitled to summary judgment on Plaintiff's "danger creation" theory.

The application of the "danger creation" theory to Defendant DuMars presents a closer call, because there is evidence that some of Mr. Chavez's sexual assaults on S.R. may have occurred during Defendant DuMars tenure as the child's treatment social worker, and the situation in the Chavez/DeHart foster home had deteriorated significantly during that time frame. Nevertheless, I conclude that Defendant DuMars is entitled to summary judgment on

the "danger creation" theory because he did not engage in "affirmative actions" which placed the child "in harm's way."  Currier, 242 F.3d at  919.

Rather, the evidence suggests that Defendant DuMars is in the position of a state actor who passively allowed this untenable situation to persist or failed to come to the rescue *after* the child was placed in harm's way during another social worker's tenure.  As such, Defendant DuMars did nothing to actively change the *status quo* in a manner that caused S.R. to be put in a position where she was more vulnerable to the alleged harm.

To be sure, a CYFD social worker's failure to come to a foster child's rescue under these circumstances may constitute an abdication of professional responsibility under the "special relationship" theory discussed above, because the existence of such a relationship may carry with it a duty to rescue (or at least exercise professional judgment).  But the "danger creation" theory is implicated only when a state actor already has undertaken some affirmative act to rescue the child from private harm, not when that actor passively declines to come to the rescue.  As noted by Judge Posner in K.H. ex rel. Murphy, 914 F.2d at 849, "[t]he distinction follows the lines of tort law.   There is no duty to rescue a bystander in distress, but having  rescued him from certain death you are not privileged to kill him." (Citations omitted.)

Even if I were to find that Plaintiff has presented evidence to establish every other element of a "danger creation" theory against Defendant DuMars, I would still conclude that he is entitled to summary judgment as to this theory based on the defense of qualified immunity.  It would go against the grain of clearly established law to conclude that

Defendant DuMars was a "danger creator" even though the evidence shows he did nothing to come to S.R.'s rescue or alter the *status quo* before the child was removed from the home on or about August 30, 2000. And by that date such a novel application of the "danger creation" theory was not sufficiently established to make it clear to a reasonable official that his conduct violated a child's constitutional right under this particular theory. See Currier, 242 F.3d at 923. For these reasons, Defendant DuMars is entitled to qualified immunity with respect to Plaintiff's "danger creation" theory.

### C.   Plaintiff's State Law Claims

In addition to the federal civil-rights claims discussed above, Plaintiff's *Third Amended Complaint* alleges that Defendants Sherman, Maes, DuMars, DeHart, CYFD and the Chavez Estate are liable for the commission of various torts under the common law of the State of New Mexico. Defendants respond that they cannot be held liable for the commission of such torts because they are entitled to immunity under the New Mexico Tort Claims Act (NMTCA) and because all of Plaintiff's state law claims are barred by the NMTCA's statute of limitations. The Chavez Estate further claims that New Mexico law does not permit Plaintiff to receive an award of punitive damages from a deceased tortfeasor. For the reasons set forth below, I conclude that neither the statute of limitations nor the immunity granted by the NMTCA provide grounds for granting summary judgment in these Defendants' favor with respect to Plaintiff's state-law claims. I also conclude, however, that the Chavez Estate is entitled to partial summary judgment on the issue of punitive damages.

Before turning to the specific provisions of New Mexico law which lead to this result, I first note that Plaintiff's *Third Amended Complaint* pleads S.R.'s tort claims against the Chavez Estate in the alternative:  either Mr. Chavez's torts were committed within the scope of his duties as a foster parent, in which case the NMTCA applies, or else he committed the listed torts outside the scope of these duties, in which case the NMTCA provides no defense.

In their motions for summary judgment, Defendants acknowledge that the NMTCA defines the term "public employee" to include licensed foster parents providing care for children in the custody of CYFD during the relevant time period.  See N.M. Stat. Ann. § 41-4-3(F)(4) (Michie 2004).  Defendants' motion papers also acknowledge the proposition that criminal conduct, such as that attributed to Mr. Chavez, may fall within the scope of a public employee's duties for purposes of the NMTCA insofar as he used his position as a public employee to carry out such conduct.  See Risk Mgmt. Div. v. McBrayer, 2000-NMCA-104, ¶ 19, 129 N.M. 778, 14 P.3d 43.

Accordingly, the analysis set forth in the parties' briefs and in this *Memorandum Opinion and Order* is directed at the tort claims to which the NMTCA may apply, *i.e.*, the claims for negligence in carrying out the duties of a public employee.  The analysis of the merits of Plaintiff's alternative claims against Mr. Chavez's estate for intentional torts such as battery, assault, false imprisonment, and intentional infliction of emotional distress is left for another day.

### 1.    Statute of Limitations on NMTCA Claims

Defendants assert that the NMTCA's two-year statute of limitations applies to Plaintiff's state-law claims for negligence, and that these claims are untimely under this statute because they were not filed within two years after S.R. left the Chavez/DeHart foster home at the end of August 2000.  The provision of the NMTCA cited by Defendants states that: "[a]ctions against a governmental entity or a public employee for torts shall be forever barred, unless ... commenced within two years ... except that a minor under the full age of seven years shall have until his ninth birthday in which to file." N.M. Stat. Ann. § 41-4-15(A) (Michie 2004).

Plaintiff asks the Court to toll the NMTCA's two-year statute of limitations by applying other statutes which specifically address minors and/or personal-injury actions involving sexual abuse of a minor.  See N.M. Stat. Ann. §§ 37-1-10, 37-1-30.  In the alternative, she contends that the NMTCA's two-year statute of limitations violates principles of due process articulated by New Mexico's appellate courts.

The parties have cited no authority from New Mexico's appellate courts which directly answers the question whether the NMTCA's two-year statute of limitations can be tolled by reference to Sections 37-1-10 or 37-1-30 of the New Mexico statutes.  I find it unnecessary to try to resolve this question in this case because, as in Campos, 2006-NMSC-020, ¶ 17, 139 N.M. 454, 134 P.3d 741, the due-process inquiry is determinative.

The due-process inquiry turns on "'whether it is reasonable to expect a person in the injured child's circumstances to meet the [TCA] requirement.'"  Id. ¶ 8 (quoting Jaramillo,

2001-NMCA-024, ¶ 7, 130 N.M. 256, 23 P.3d 931).  For the reasons previously articulated

with respect to Plaintiff's federal civil-rights claims, I conclude that it is not reasonable to

expect S.R. to meet the NMTCA's two-year statute of limitations given her tenuous foster-

care and adoption situation.  In particular, I do not view her guardian ad litem's actions in

retaining another private attorney for her in September 2001 as providing reasonable grounds

for holding the child's state-law claims to the NMTCA's two-year statute of limitations,

given that the guardian ad litem was the same person who previously recommended that S.R.

be placed in the Chavez/DeHart foster home in the first place.  See id. ¶ 15 (finding that the

NMTCA's two-year statute of limitations violated a child's right to due-process where "the

parent who was supposed to file a timely suit on [the child's] behalf is the same parent who

. . . left her daughter with the boyfriend who then sexually assaulted her").  Accordingly,

Defendants' motions for summary judgment on Plaintiff's state-law claims are denied with

respect to the statute-of-limitations defense.

### 2.    Statutory Immunity Under the NMTCA

Even if Plaintiff's state-law claims are timely under the due-process analysis

articulated above, Defendants maintain that the NMTCA provides them with immunity from

liability for any tort recognized under state law.  See N.M. Stat. Ann. § 41-4-4(A) (Michie

2004).  To defeat such statutory immunity, Plaintiff relies on the waiver of immunity

provided in Section 41-4-6 of the NMTCA.  This waiver provides that: "The immunity

granted pursuant to Subsection A of Section 41-4-4 . . . does not apply to liability for

damages resulting from bodily injury, wrongful death or property damage caused by the

negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6.[4]

Plaintiff points out that New Mexico's appellate courts have not restricted the waiver of liability under Section 41-4-6 to claims arising solely from physical defects in a public building or its contents. See Leithead v. City of Santa Fe, 1997-NMCA-041, ¶ 5, 123 N.M. 353, 940 P.2d 459.   Rather, this waiver also may apply to certain acts or omissions which create an unsafe or dangerous condition on the property or its surroundings that poses a risk to the general public. See id.

Thus, the operational or maintenance activities which may fall under Section 41-4-6 include controlling ingress and egress to buildings and grounds in a manner that allows vicious dogs, violent gang members, or improperly trained security guards to roam the premises and thereby pose a risk of injury to the general population occupying or visiting those premises. See, e.g., Castillo v. County of Santa Fe, 107 N.M. 204, 207, 755 P.2d 48, 51 (1988) (vicious dog roaming grounds of public housing project); Callaway v. New Mexico Dept. of Corrections, 117 N.M. 637, 642, 875 P.2d 393, 398 (Ct. App. 1994) (violent gang members in state correctional facilities); Baca v. State, 1996-NMCA-021, ¶ 10, 121 N.M. 395, 911 P.2d 1199 (improperly trained security guards on state-fair grounds).

---

[4]Plaintiff does not assert a waiver of immunity under the NMTCA's exceptions for medical facilities, N.M. Stat. Ann. § 41-4-9, health-care providers, id. § 41-4-10, and law-enforcement officers, id. § 41-4-12.  Therefore, these provisions are not addressed in this *Memorandum Opinion and Order*.

The waiver of immunity under Section 41-4-6 also may extend to situations where a physical feature of the premises poses a risk of injury to the public if left unguarded, as in the case of swimming pools frequented by children. See, e.g., Leithead, 1997-NMCA-041, ¶ 16; Seal v. Carlsbad Indep. Sch. Dist., 116 N.M. 101, 105, 860 P.2d 743, 747 (1993).

On the other hand, Defendants point out that the waiver of immunity in Section 41-4-6 of the NMTCA is not construed so broadly as to encompass any negligent act or omission that happens to occur within or near a building, public park, or piece of machinery, equipment, or furnishings associated with the State. Such a broad construction would violate the principle that "[s]tatutory provisions purporting to waive governmental immunity are strictly construed." Rutherford v. Chaves County, 2003-NMSC-010, ¶ 11, 133 N.M. 756, 69 P.3d 1199. Thus, for example, the waiver of immunity under Section 41-4-6 does not apply to negligence that arose from the duty to supervise a child in a day-camp undertaking, rather than a duty to remedy a danger to the general public posed by the physical condition of the premises on which the day camp was operated. See Espinoza v. Town of Taos, 120 N.M. 680, 684, 905 P.2d 718, 722 (1995). Similarly, there is no waiver of immunity under this section of the NMTCA where the negligence attributed to the State arose from a duty to supervise schoolchildren's interaction with one another, see Pemberton v. Cordova, 105 N.M. 476, 478, 734 P.2d 254, 256 (Ct. App. 1987), as opposed to a danger to the public posed by operation or maintenance of the school building itself, see Williams v. Central Consol. Sch. Dist., 1998-NMCA-006, ¶ 17, 124 N.M. 488, 952 P.2d 978.

The authorities cited above illustrate that the applicability of Section 41-4-6 may turn on "exceedingly fine" distinctions. Baca, 1996-NMCA-021, ¶12. Nevertheless, the Court's task of sifting through these authorities is aided by some reported opinions that specifically address tort liability in the context of the State's operation or maintenance of foster homes.

In M.D.R. v. State ex rel. Human Servs. Dep't, 114 N.M. 187, 836 P.2d 106 (Ct. App. 1992), a panel of the New Mexico Court of Appeals rejected the argument that the "operation" of a foster home fell within the NMTCA's waiver of immunity relating to medical facilities or health-care providers, see N.M. Stat. Ann. §§ 41-4-9, -10. But a concurring opinion by Judge Minzner (who subsequently became a Justice of the New Mexico Supreme Court) left open the possibility that "supervision of actual day-to-day operation [of a foster home] . . . might be equated with operation" of a building under Section 41-4-6. Id. at 192, 836 P.2d at 111 (Minzner, J., concurring).

Drawing on the concurring opinion in M.D.R., another panel of the New Mexico Court of Appeals subsequently concluded that a public employee's regulatory control and supervision of the day-to-day operations of a foster home may fall under the waiver of immunity for "operation and maintenance" of a building as contemplated in Section 41-4-6 of the NMTCA. See Young v. Van Duyne, 2004-NMCA-074, ¶ 20, 135 N.M. 695, 92 P.3d 1269. The Tenth Circuit recently expanded on this conclusion in Holmes, 455 F.3d at 1140:

> Under the NMTCA, foster parents are "public employees," and hence the "operation" of their home is by the State. N.M. Stat. Ann. § 41-4-3(F)(4). New Mexico regulations make clear that, although foster parents are private citizens, they play a public role when they take in foster children. "The foster parent is a member of the child's case management team and, as a team

member, participates in the development and implementation of team plans and may participate in conferences, citizen review boards, judicial reviews, individual education plans, etc.  Foster parents do not make independent plans for children in their care."  N.M. Admin.  Code § 8.27.2.19(C) (emphasis added).  Instead, "foster parents cooperate with and carry out the [Department] plans for the child."  Id. Further, the State directly controls day-to-day parenting in foster homes.  For instance, State regulations specifically require foster children to be assigned household chores, id. § 8.27.3.22, and foster parents are forbidden from making negative comments about the foster children's birth parents.  N.M. Admin.  Code § 8.27.3.25. New Mexico regulations also specifically regulate the buildings in which foster parents live.  See id. §§ 8.27.2.15;  8.27.3.11; N.M. Stat. Ann. § 40-7a-4(D).

(Footnote omitted).  These authorities strongly suggest that the waiver of immunity in Section 41-4-6 of the NMTCA applies to the Defendants' "operation and maintenance" of the Chavez/DeHart foster home in this case.

Defendants contend that regardless of whether they operated or maintained the foster home for purposes of Section 41-4-6, they cannot be held liable in this case because the particular risk that Mr. Chavez posed to S.R. was not "a potential risk to the general public." Espinoza, 120 N.M. at 683, 905 P.2d at 721.  I reject this contention for two reasons.

First, Defendants' argument seems to conflate the elements of Plaintiff's federal civil-right claims with the elements of her state-law claims for negligence.  The question presented at this juncture is not whether the more stringent and specific elements of a federal civil-rights claim can be subsumed under a statutory waiver of immunity for Defendants' operation or maintenance of the Chavez/DeHart foster home.  Rather, the question is whether such a waiver of immunity applies to a common-law claim for negligence.  And unlike Plaintiff's federal civil-rights claims, which are very specifically focused on the violation of

-61-

this particular child's constitutional right to substantive due process, her state-law claims for negligence may be premised on a more general duty of care owed to children in foster homes or otherwise in state custody, so long as the duty in question has some nexus to the operation or maintenance of the home itself, and a breach of that duty was both a proximate cause and a cause in fact of the specific injury that S.R. suffered. See generally Spencer v. Health Force, Inc., 2005-NMSC-002, ¶ 18, 137 N.M. 64, 107 P.3d 504 (listing elements of a common-law negligence claim).

Second, New Mexico's appellate courts have not limited Section 41-4-6's waiver of immunity to situations where the property in question is accessible or dangerous to every single member of the public. On the contrary, they have applied this waiver to risks that were particularly dangerous to children, see, e.g., Leithead, 1997-NMCA-041, ¶ 16 (children and swimming pools), or to the particular class of persons that make use of the facility in question, see, e.g., Callaway, 117 N.M. at 642, 875 P.2d at 398 (persons detained in state correctional facilities). Thus, the fact that the State does not own the building where the tort occurs, or that the building is not accessible or dangerous to every single member of the general public, is not dispositive. See Cobos v. Dona Ana County Housing Auth., 1998-NMSC-049, ¶¶ 8, 20, 126 N.M. 418, 970 P.2d 1143; Upton v. Clovis Municipal Sch. Dist., 2006-NMSC-040, ¶ 23, ___ P.3d ___, 2006 WL 2612563 (as revised Sept. 12, 2006). Indeed, the statutory language refers to operation or maintenance by "public employees" but does not state that the facility itself must be "public," except in the case of a "public park." N.M. Stat. Ann. § 41-4-6.

In rejecting Defendants' contentions to the contrary, the Court does not mean to suggest that Section 41-4-6's waiver of immunity would apply to every tort that happens to occur on the premises of a facility associated with the State.   One important limiting principle that can be gleaned from the cases cited above is that there must be some nexus between the duty of care on which the tort claim is premised and the operation or maintenance of one of the types of facilities listed in Section 41-4-6.   Thus, for example, New Mexico's appellate courts have declined to apply Section 41-4-6 to torts that arose from a general duty to supervise a child in a day-camp undertaking, see Espinoza, 120 N.M. at 684, 905 P.2d at 722, or to supervise school children's interaction with one another, see Pemberton, 105 N.M. at 478, 734 P.2d at 256, where that duty had no nexus to the operation or maintenance of the property on which that undertaking occurred.

As articulated in Holmes, 455 F.3d at 1140, the State of New Mexico's regulation of foster homes is extensive and encompasses a broad range of duties.   In this case, the evidence of record shows that Defendants' duties in regulating and supervising the foster home covered issues such as which parent was responsible for staying home and minding the children during the day, which children were given separate bedrooms, where the foster parents slept in relation to the children's bedrooms, the installation of a motion detector to detect any nocturnal ingress or egress from the bedrooms, and the foster parents' control of this motion detector.  [Ex. 1, 2 to Doc. 138.]  These duties extend beyond mere supervision of the family members' interactions with one another and evince a specific nexus to a "building . . . machinery, equipment or furnishings."   N.M. Stat. Ann. § 41-4-6.   And

-63-

Defendants' day-to-day operation of the physical premises where the foster family resided also has a nexus to the injuries Plaintiff suffered when Mr. Chavez allegedly used his control of the home environment to surreptitiously rape S.R. while she lay in her bedroom at night or at other times and locations where such activities could be concealed from the rest of the family. [Ex. 3 to Doc. 205; Ex. 2 to Doc. 206.]

In these respects, the evidence in this case bears some analogy to other cases where the waiver of immunity turned on public employees' control of ingress and egress to buildings and grounds. See Castillo, 107 N.M. at 207, 755 P.2d at 51 (vicious dog roaming grounds of public housing project); Callaway, 117 N.M. at 642, 875 P.2d at 398 (violent gang members in state correctional facilities); Baca, 1996-NMCA-021, ¶ 10 (improperly trained security guards on state-fair grounds). For these reasons, I conclude that there is a genuine issue of material fact as to whether the waiver of immunity stated in Section 41-4-6 of the NMTCA applies to Plaintiff's state-law claims for negligence. It follows that Defendants are not entitled to summary judgment on their claims that they are immune from liability under the NMTCA.

### 3.      Punitive Damages Against the Chavez Estate

The final issue briefed by the parties is whether the Chavez Estate is entitled to partial summary judgment with respect to punitive damages on Plaintiff's remaining state-law claims. The New Mexico Supreme Court has adopted the majority rule barring the recovery of punitive damages from the estate of a deceased tortfeasor. See Jaramillo v. Providence Washington Ins. Co., 117 N.M. 337, 345-46, 871 P.2d 1343, 1351-52 (1994) (collecting

cases).  The rationale behind this rule is that "to punish the estate ignores the central purpose of punitive damages, which is to punish the tortfeasor and to deter him from repeating the wrongful act."  <u>Id.</u> at 345, 871 P.2d at 1351.

Plaintiff asserts that this rationale is not persuasive because punitive damages may serve other purposes besides punishing or deterring the tortfeasor.  The New Mexico Supreme Court considered and rejected this argument in <u>Jaramillo</u>, 117 N.M. at 345, 871 P.2d at 1351, and Plaintiff cites no contrary authority from the State's highest court. Therefore, the Chavez Estate is entitled to partial summary judgment precluding the recovery of punitive damages on Plaintiff's remaining state-law claims against this Defendant.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that the Chavez Estate is entitled to summary judgment on Plaintiff's federal civil-rights claims based on the absence of state action, and that Defendant Maes is entitled to summary judgment on Plaintiff's federal civil-rights claims based on the defense of qualified immunity.  In addition, the Chavez Estate is entitled to partial summary judgment on the issue of punitive damages.  There are disputed issues of material fact, however, which preclude summary judgment or judgment on the pleadings as to Plaintiff's federal civil-rights claims against Defendants Sherman and DuMars, and with respect to Plaintiff's state-law negligence claims against each Defendant. With respect to Plaintiff's federal civil-rights claims, I further conclude that Plaintiff may proceed on a "danger creation" theory as to Defendant Sherman only, while Plaintiff's "special relationship" theory is viable as to both Defendant Sherman and Defendant DuMars.

**IT IS, THEREFORE, ORDERED** that *Defendant Tyler DuMars, Angela Maes, and Cynthia Sherman (f/k/a Couch) Consolidated Motion and Incorporated Memorandum for Summary Judgment* [Doc. 188] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**IT IS FURTHER ORDERED** that *Defendant Estate of Peter Chavez and Louise DeHart's Motion for Judgment on the Pleadings and/or for Summary Judgment* [Doc. 193] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**SO ORDERED**, this 30th day of September 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
*United States District Judge*